UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

KRISTI LYNCH,

        Plaintiff,

v.

NORTH AMERICAN COMPANY FOR
LIFE AND HEALTH INSURANCE, an
Iowa Corporation, and ARTHUR J.
GALLAGHER & CO. INSURANCE
BROKERS OF CALIFORNIA, INC., a
California Corporation,

        Defendants.

NORTH AMERICAN COMPANY FOR
LIFE AND HEALTH INSURANCE, an
Iowa Corporation,

        Counterplaintiff,

vs.

KRISTI LYNCH,

        Counterdefendant.

Case No. 1:16-cv-00055-CWD

**MEMORANDUM DECISION AND
ORDER**

# INTRODUCTION

Before the Court is North American Company for Life and Health Insurance's motion for summary judgment (Dkt. 48), and Kristi Lynch's motion to strike the Affidavit of John Robbins (Dkt. 64).[1] Lynch was the owner and beneficiary of a life insurance policy she claims was prematurely terminated without proper notice. North American seeks summary judgment on Lynch's claims, and its counterclaim for declaratory relief on the grounds that the life insurance policy it had issued was properly terminated. The Court conducted a hearing on the motions on December 12, 2017. After hearing oral argument, reviewing the parties' memoranda, and researching relevant authorities, the Court will deny North American's motion for summary judgment, and sustain, in part, Lynch's evidentiary objection to the affidavit.[2]

# FACTS[3]

Kathleen Kelly Sharpe (the "Insured") applied for a $750,000 life insurance policy on or around September 13, 1989, listing Kristi Lynch, the Insured's stepdaughter, as owner and beneficiary. John Cookman, then a broker at MCN Insurance Brokers, Inc.,

---

[1] All claims against Defendant Arthur J. Gallagher & Co. Insurance Brokers of California, Inc., were dismissed with prejudice, via the parties' stipulation on June 6, 2017. (Dkt. 59, 60.)

[2] Motions to strike are not favored under Rule 56. Instead, the proper procedure is an objection, contained within the responding party's brief. The objection functions much as an objection at trial, and the burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated. Fed. Rule Civ. P. 56(c) advisory committee's note to 2010 amendment. Accordingly, the Court will construe the motion to strike as an evidentiary objection.

[3] The facts contained in this section are undisputed unless otherwise indicated. When the facts are disputed, they are taken in the light most favorable to Lynch, the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (recognizing the district court's obligation to construe the record in the light most favorable to the nonmoving party on motion for summary judgment).

helped the Insured complete the application. Cookman submitted the application to CPS Insurance Services, that in turn submitted the application to North American. A flexible premium adjustable life insurance policy, policy number LW00006377, was issued to Lynch, on or around November 7, 1989 (the "Policy"). The Policy has a Specified Amount of $750,000 and, per the Application, names Lynch as owner and beneficiary. The Policy's planned periodic premium was $9,625 annually.

The Policy's terms provide that, after November 7, 2004, the Policy will lapse when the surrender value is insufficient to cover the next monthly deduction. Upon a lapse, the Policy will enter a 61-day grace period during which the owner may make a premium payment to keep the Policy in force and avoid termination. The Policy further provides:

> Notice of the premium required to keep the policy in force is mailed to your last known address at least 30 days prior to termination. Such premium is due on such Monthly Anniversary Day and if not paid within the grace period, all coverage under this policy terminates without value at the end of the 61 day period.

Lynch's mailing address has been the same post office box in Picabo, Idaho, since late 2011. Lynch made regular premium payments from November 1989 to November 2006, but did not make any payments from December 2006 to December 2009. Lynch also tendered a partial surrender of $14,716 on or around September 24, 2009, to receive a check in that amount. The Policy then entered a grace period on December 7, 2009, and North American sent Lynch a grace notice informing her she had to remit either the planned periodic premium or at least $626.88 to prevent the Policy from terminating. The

grace notice also informed Lynch that sending the $626.88 "minimum payment will provide coverage for this month only and will not prevent your policy from entering the 61 day grace period again next month, perhaps for a different amount. This minimum payment will not provide for the planned long term performance of your policy." The grace notice further instructed Lynch to contact North American if she had questions about her premiums or the Policy's performance. Lynch did not contact North American but instead made the minimum $626.88 payment on or around January 5, 2010.

Lynch did call North American on at least two occasions. On September 2, 2010, she called North American inquiring about a personal "note" she found that discussed premium payments. Lynch also called North American on August 12, 2011, because she had misscheduled a payment and was afraid the policy had lapsed. The North American representative suggested that Lynch set up automatic payments. Although North American sent Lynch paperwork to do so, Lynch did not follow through on the suggestion. Lynch instead continued to make either a minimum payment or a payment in an amount not indicated in the Policy or any grace notice, causing the Policy to enter a grace period on numerous occasions.

North American sent Lynch 36 grace notices between December of 2009 and May of 2015.[4] Each grace notice contained the same or similar information as the December 7,

---

[4] North American indicates that, for example, a December 7, 2010 grace notice listed the minimum payment as $572.88, and Lynch made a $572.88 payment on December 20, 2010; an April 7, 2011 grace notice listed the minimum payment as $627.98, and Ms. Lynch made a $628.00 payment on June 3, 2011; a July 7, 2011 grace notice listed the minimum payment as $623.94, and Ms. Lynch made a $623.94 payment on September 6, 2011.

2009 grace notice. The Policy entered another grace period on June 7, 2015, because the monthly deduction exceeded the Policy's surrender value. North American asserts it mailed a grace notice to Lynch on June 8, 2015, following its standard mail room procedures.

John Robbins, Associate Vice President for Life and Variable Services for North American's parent company, Sammons Financial Group Member Companies, submitted an affidavit describing North American's mail room procedures. As Associate Vice President, Robbins oversees the Policy Billing and Accounting Team. The Policy Billing and Accounting Team is responsible for all billing procedures and matters, including the generating, issuing, and mailing of grace notices and termination of policies. Accordingly, Robbins testified he has "firsthand knowledge of the policies, procedures, and processes for generating, issuing, and mailing grace notices North American had in effect before, during, and after June of 2015." Robbins Aff. ¶ 4. (Dkt. 50 at 3.)

In his affidavit, Robbins explains that, "[p]er North American's policies and procedures, June 7, 2015, was a Sunday so North American's computer system ("LifeComm") reviewed the Policy on June 8, 2015, and determined the Policy had entered a grace period." Robbins Aff. ¶ 19. Robbins explained that LifeComm then printed three grace notices – the Owner Grace Notice to send to Lynch (the "Lynch Grace Notice"), the Agent Grace Notice to send to CPS Insurance Services, Inc. (the "CPS Grace Notice"), and the File Copy Grace Notice for North American to retain (collectively, the "Grace Notices") – in the computer room. *Id.* ¶ 21.

The addresses of record for Lynch and CPS Insurance Services at the time were the post office box in Picabo, Idaho, and 4400 MacArthur Blvd 8th Floor, Newport Beach, CA 92660, respectively. The computer room routed all grace notices printed on June 8, 2015, including the Grace Notices, to Policy Billing and Accounting, which sorted the grace notices and delivered them to the Advanced Processing Support team ("APS"). *Id.* ¶ 26.

Robbins indicated the grace notices would have then been placed in the outgoing mail bin, which the mail room picked up and delivered to North American's mailing vendor. North American's mailing vendor next would have used a folding machine to place the grace notices in envelopes, with the addresses printed on the grace notices visible through the envelope's window. The envelopes containing the Lynch and CPS Grace Notices were then run through a postage reader for postage and sent out as first class mail on June 9, 2015. *Id.* at 31.

Neither the Lynch nor CPS Grace Notices were returned as undeliverable. *Id.* at 32. CPS Insurance Services received the CPS Grace Notice. The June 8, 2015 Grace Notice informed Lynch (and CPS) that a $2,000 premium payment was received on May 19, 2015, but that a $935.18 "minimum additional premium" was required by August 7, 2015, to avoid termination of coverage. The grace notice also stated that:

> Payment of the minimum additional premium reflected above to avoid termination of coverage will not prevent the Policy from entering another grace period on its next monthly deduction day. Also, please note that payment of any regularly scheduled planned premiums for which you may receive premium notices or which may be automatically paid from your bank account may no longer be sufficient to

prevent your coverage from terminating. We strongly encourage you to contact your agent or our office at (877) 872-0757 to obtain additional information to assist you in determining a planned premium payment amount and schedule that reflects your current goals for the Policy.

During their depositions, both Kristi Lynch and her husband, Philip Lynch, testified they did not know whether the June 8, 2015 Grace Notice was delivered to their post office box. More specifically, Kristi Lynch testified that:

> Q. So going back to this big packet of grace notices.
> A. Okay.
> Q. From May 7th, if you could turn the page to June 8, 2015. So the second to last page
> A. Oh, ok. Thank you.
> Q. Uh-huh.
> A. June 8th. Okay.
> Q. Have you ever seen this grace notice before?
> A. No, I have not.
> Q. All right. Let's see. It's addressed to PO Box [] in Picabo, Idaho 83348. Is that correct?
> A. That's correct.
> Q. And it's dated June 8, 2015. Is that correct?
> A. Yes.
> Q. And so, to the best of your knowledge, is that an accurate address – mailing address, PO Box [] –
> A. Yes.
> Q. - for you on or around June 8, 2015?
> A. Yes.
> Q. Do you know if this grace notice was received in the mail?
> A. I have no idea.
> Q. So maybe it was and maybe it wasn't?
> A. Correct.
> Q. Okay. So you said earlier that Phil and only Phil would pick up the mail from the post office box?
> A. Yes.

Kristi Lynch testified that her husband, Philip Lynch, would pick up the mail:

> Q. Okay. Is it possible that the grace notice was delivered to
> your PO Box but somehow Phil missed it?
> A. You'd have to ask Phil.
> Q. So you don't know?
> A. I don't know.

(Kristi Lynch Depo. at 106:8-108:20, Dkt. 52 at 32.)

Philip Lynch similarly testified that:

> Q. All right. So the next, we'll say, four documents: February
> 9, 2015; March 9, 2015; May 7, 2015; and June 8, 2015.
> A. Uh-huh.
> Q. Do you see that?
> A. Uh-huh. I do.
> Q. Have you ever seen these documents before?
> A. I have not.
> Q. So they're all addressed to PO Box []. Is that correct?
> A. And that would be correct for that time.
> Q. For the whole time frame?
> A. Yes. Uh-huh.
> Q. Do you know if these documents were delivered to your
> mailing address at the time?
> A. I do not.
> Q. So that's true for the February, March, May and June
> 2015?
> A. Uh-huh.
> Q. Yes?
> A. Yes.

(Philip Lynch Depo. at 107:7 – 108:3, Dkt. 53 at 32.)

In her affidavit, Kristi Lynch explained that, to date, she has paid approximately

$182,631.21 in premiums on the Policy. She testified she never received the June 8, 2015

Grace Notice letter stating an additional $935.18 was required on or before August 7,

2015, to prevent termination of coverage under the Policy. In response to previous letters

from North American, Lynch had sent three checks of $2,000.00 each in March, April,

and May of 2015, under her belief premiums were approximately $1,000.00 per month, and that her payments covered six months of premium payments. Lynch Aff. ¶ 3. (Dkt. 62 at 2.)

Similarly, Phil Lynch, who regularly picks up the couples' mail, testified he never picked up or saw a copy of the June 8, 2015 Grace Notice in their post office box, and never saw one in the house where they usually kept the mail. No one else was responsible for picking up their mail during this time period. Lynch Aff. ¶ 5. (Dkt. 63 at 2.)

Lynch did not submit a premium payment to North American on or before August 7, 2015, so coverage under the Policy terminated effective August 8, 2015. Lynch received a letter dated August 11, 2015, terminating the Policy without further notice. Lynch attempted to reinstate the Policy, sending a check for $20,343.96 in advance premium payments, which North American refused. Instead, North American offered to reinstate the Policy subject to medical underwriting, but Lynch rejected the offer.

Lynch claims that mis-deliveries and failed deliveries of mail at their rural post office were not uncommon. North American did not send the June 8, 2015 Grace Notice by certified mail. North American, on the other hand, claims Lynch never told North American she had difficulty receiving mail prior to the Policy termination and did not designate a Secondary Addressee to receive grace notices or other correspondence.

## ANALYSIS

### 1.    Motion to Strike

Before considering the motion for summary judgment, the Court will address Lynch's motion to strike portions of the Affidavit of John Robbins. (Dkt. 50, 64.)

Specifically, Lynch argues Robbins's testimony stating unequivocally that LifeComm (the computer system) printed three grace notices (the Lynch Grace Notice, the CPS Grace Notice and the File Copy Notice); routed all three grace notices to Policy Billing and Accounting, which sorted them and delivered them to APS; and the Lynch and CPS Grace Notices were sent out in the mail on June 9, 2015, should be stricken because Robbins lacks first-hand knowledge. At best, Lynch argues Robbins can establish the general procedures for issuing and mailing grace notices, but Robbins does not possess actual knowledge whether the three grace notices at issue were printed and mailed consistent with his testimony.

In response, North American argues Robbins's affidavit detailing the company's policies and procedures is admissible to show the grace notices were mailed. North American cites several authorities which it contends support its argument that evidence of the custom and business practices of the company is proper proof of notice, and that receipt (by CPS) of the notice can constitute evidence the company's practices were followed. *First Nat'l Bank of Independence v. Mid-Century Ins. Co.*, 559 S.W.2d 50 (Mo. Ct. App. 1977).

Only admissible evidence may be considered in ruling on a motion for summary judgment. *Orr v. Bank of Am.*, 285 F.3d 764, 773 (9th Cir. 2002); *see also* Fed. R. Civ. P. 56(e). Pursuant to Fed. Rule Civ. P. 56(c), "an affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Federal Rule of Evidence 602 states, "[a] witness may testify to a

matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may consist of the witness's own testimony." Federal Rule of Evidence 406 allows introduction of evidence of an organization's routine practice, instructing that the evidence "may be admitted to prove that on a particular occasion the…organization acted in accordance with the habit or routine practice."

Based upon these rules, it is clear Robbins' testimony is admissible insofar as he describes the customary mailing process he is aware North American used for preparing and mailing grace notices in 2015. However, there is no direct evidence establishing the June 8, 2015 Grace Notices were prepared and mailed using the same process. At best, the Court concludes Robbins's testimony establishes the company's general mailing procedures, and based upon customary practice, he assumes the Grace Notices were prepared and mailed using the same process. However, there were several steps in the mailing process, which consisted of the computer recognizing the deadline had lapsed, and then printing, sorting, delivering, folding, and finally, stuffing envelopes and affixing postage by various individuals or machines. And it was not just the Lynch policy notices that were subject to this process; presumably, there were hundreds of similar notices. But, other than the Grace Notice received by CPS and North American's file copy the Robbins affidavit contains no computer logs, vendor receipts, or other similar records to confirm the customary process was actually followed on this one occasion.

Consequently, the portions of the Affidavit of John Robbins where he asserts that the June 8, 2015 Grace Notices were actually prepared and mailed according to

customary mailing procedures are stricken and these statements will not be considered by the Court. *See* Robbins' Aff. ¶¶ 21, 26, and 31 (Dkt. 50.) However, the testimony is properly considered to establish the usual and customary mailing practice followed by North American. The evidentiary objection will therefore be sustained in part, as the testimony will not be entirely disregarded. The Court will discuss the effect of its evidentiary ruling in more detail in the context of its analysis pertinent to the motion for summary judgment below.

## 2. Motion for Summary Judgment

### A. *Standards of Law*

#### (1) *Summary Judgment Standard*

Summary judgment is appropriate where a party can show that, as to any claim or defense, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). One of the principal purposes of the summary judgment "is to isolate and dispose of factually unsupported claims...." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). It is "not a disfavored procedural shortcut," but is instead the "principal tool[] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources." *Id*. at 327. "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986). There must be a genuine dispute as to any material fact – a fact "that may affect the outcome of the case." *Id*. at 248.

The evidence must be viewed in the light most favorable to the non-moving party, and the Court must not make credibility findings. *Id*. at 255. Direct testimony of the non-movant must be believed, however implausible. *Leslie v. Grupo ICA*, 198 F.3d 1152, 1159 (9th Cir. 1999). On the other hand, the Court is not required to adopt unreasonable inferences from circumstantial evidence. *McLaughlin v. Liu*, 849 F.2d 1205, 1208 (9th Cir. 1988).

The Court must be "guided by the substantive evidentiary standards that apply to the case." *Liberty Lobby*, 477 U.S. at 255. If a claim requires clear and convincing evidence, the question on summary judgment is whether a reasonable jury could conclude that clear and convincing evidence supports the claim. *Id*.

The moving party bears the initial burden of demonstrating the absence of a genuine dispute as to material fact. *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc). To carry this burden, the moving party need not introduce any affirmative evidence (such as affidavits or deposition excerpts) but may simply point out the absence of evidence to support the nonmoving party's case. *Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 532 (9th Cir. 2000).

This shifts the burden to the non-moving party to produce evidence sufficient to support a jury verdict in her favor. *Devereaux*, 263 F.3d at 1076. The non-moving party must go beyond the pleadings and show "by her [] affidavits, or by the depositions, answers to interrogatories, or admissions on file" that a genuine dispute of material fact exists. *Celotex*, 477 U.S. at 324.

**(2)** *Insurance Contracts*

Idaho courts construe insurance contracts by their plain, unambiguous language; but where the insurance contract is ambiguous, it must be construed in a light most favorable to the insured and in a manner providing full coverage for the indicated risks, rather than narrowing its protection. *See Axis Surplus Ins. Co. v. Lake CDA Dev*., 2008 WL 4238966, *2 (D. Idaho 2008) (citing *Cascade Auto Glass, Inc. v. Idaho Farm Bureau Ins. Co*., 115 P.3d 751 (Idaho 2005)). "In construing an insurance policy, the Court must look to the plain meaning of the words to determine if there are any ambiguities." *Id*. This determination is a question of law for the Court, and the Court must construe the insurance policy as a whole, not by isolated phrases. *Id*.

Like other contracts, insurance policies are ambiguous if they are reasonably subject to conflicting interpretations. *Id*. If so, the meaning is controlled by the underlying intent of the parties. *See Mintun v. Blades*, 2008 WL 711636, *16 (D. Idaho 2008) (citing *Navarette v. City of Caldwell*, 949 P.2d 597 (Idaho Ct. App. 1997)). Intent is a question of fact, to be determined by the factfinder; in contrast, if a contract is unambiguous, the determination of the contract's meaning and legal effect is a question of law. *Id*.

**B.** *Analysis*

**(1)** *Proof of Notice*

The policy provision applicable to notice of cancellation provides as follows: "Notice of the premium required to keep the policy in force is mailed to your last known address at least 30 days prior to termination." "Generally speaking, provisions for notice

of cancellation of insurance policies are intended to prevent cancellation of the policy without allowing the insured ample opportunity to obtain other insurance." *Crowley v. Lafayette Life Ins. Co.*, 683 P.2d 854, 858 (Idaho 1984).

North American argues the Policy required only that the grace notice be placed in the mail. The parties do not disagree that the Policy required mailing, and not actual receipt by Lynch, of the grace notice. However, the central issue here is the sufficiency of proof of mailing introduced by North American in support of its motion for summary judgment. It is the quality of proof, and the Court's inability to draw inferences from that proof upon summary judgment, that is the sticky wicket. As explained below, while evidence of North American's customary mailing practices may be admissible, it is not for the Court to draw inferences from such evidence when Lynch has countered with proof of non-receipt.

In *Superior Ins. Co. v. Restituto*, 124 F.Supp. 392, 394-95 (S.D. Cal. 1954), the insured similarly claimed he never received notice of termination. In that case, the policy language provided the policy could be "cancelled by the company by mailing to the named insured at the post office address showing in this policy, written notice of cancellation. The mailing of the notice as aforesaid shall be sufficient proof of the notice…." *Superior Ins. Co.*, 124 F.Supp. at 394. The insurer mailed the notice of cancellation to the insured's last known address, and obtained a return receipt from the post office for the piece of mail. The court held cancellation was effective, even though the notice was never received by the insured. *Id.* at 395. In contrast here, North

American's testimony about its customary mailing procedures is not equivalent to proof of mailing via return receipt.

North American, relying upon *Wallin v. C.I.R.*, 744 F.2d 674, 676 (9th Cir. 1984), asserts the obligation to mail notice, and provide proof of the same, does not require proof of actual receipt. But the *Wallin* court held that, where the IRS had knowledge the taxpayer had moved, and possessed the ability to confirm the new address, the notice delivered to the wrong address was insufficient to prove notice. *Id.* at 677.[5] *See also Clodfelter v. C.I.R.*, 527 F.2d 754, 756 (9th Cir. 1975) (holding that where address shown by taxpayer's returns was a new address, notice of deficiency mailed to a prior address and actually received by taxpayers as evidenced by return receipt was sufficient for proof of notice). North American's reliance upon *Wallin* is misplaced, because the issue in that case was whether the IRS could rely upon its mailing to the wrong address to establish proof of notice when it had knowledge of the correct address. Further, the IRS is required by law to send tax deficiency notices by certified or registered mail; such was not done here.

While the Court agrees the Policy's language does not require actual receipt of notice by the insured, proof of mailing beyond speculation or inference based upon custom and practice is required at the summary judgment stage. The following cases

---

[5] Under federal law, the IRS must send tax deficiency notices by certified or registered mail, and notice is sufficient regardless of receipt, provided it is mailed to the taxpayer's last known address. *Wallin*, 744 F.2d at 676.

illustrate why the Court cannot grant summary judgment in favor of North American on the facts presented.

In *Allstate Ins. Co. v. Thacher*, No. CV-08-3326-RSWL, 2009 WL 10659629 (C.D. Cal. June 30, 2009), the issue was whether the insurance company adequately provided proof of notice to the insured regarding cancellation of her policy. Under California law, insurers must strictly adhere to termination provisions in insurance contracts. *Allstate Ins. Co.*, 2009 WL 10659629 at *12. Allstate contended it mailed a letter to its insured's last known address. As proof, Allstate submitted the declaration of one of its representatives who declared she was familiar with Allstate's procedures for mailing notices of non-renewal and that, according to such procedures, the non-renewal letter would have been sent 60-90 days prior to non-renewal via U.S. mail. A copy of the letter was kept in Allstate's computerized records system. The Thachers disputed Allstate's contention, denying receipt of any notice, and pointed out Allstate had no actual proof of mailing. Under those facts, the court denied Allstate's motion for summary judgment, finding a triable issue of fact concerning whether Allstate sent notice of the policy termination. *Id.* at *13. In other words, non-receipt was sufficient to rebut evidence of mailing based upon custom and practice.

Similarly, in *Preis v. Am. Indemnity Co.*, 269 Cal. Rptr. 617, 621 (Cal. Ct. App. 1990), the court found the evidence inconclusive to support a motion for summary judgment where the insurer submitted a declaration describing the insurer's procedures

for preparing and mailing cancellation notices.[6] The court commented that, assuming the testimony as to the insurer's habit and custom in mailing cancellation notices was admissible to prove a notice of cancellation was mailed, the evidence was contradicted by the insured's declaration that he did not receive the notice. *Preis*, 269 Cal. Rptr. at 622. Accordingly, the court denied the insurer's motion for summary judgment, because the insured's declaration of non-receipt raised a triable issue of fact as to whether the notice was mailed. *Id.*

And last, in *McCray v. State Farm Fire & Cas. Ins. Co.*, 892 So. 2d 363, 368 (Ala. 2004), the court held the insurer had not met its burden upon summary judgment to establish proof of mailing of a notice of coverage termination to its insureds. There, the insurer offered evidence of mailing via the affidavit of its payment plan supervisor, and photographs of the envelopes addressed to the insureds. The insureds claimed non-receipt, and pointed also to their bank's non-receipt of its copy of the cancellation notice. Upon summary judgment, the court held the conflicting evidence presented a question of fact for the jury whether the insurer properly mailed the cancellation notice. *Id.* at 369.

The examples North American cites purportedly demonstrating that courts allow affidavits detailing a company's policies and procedures to show a letter was mailed are either distinguishable, or not applicable here upon summary judgment. First, North American cites *Morales v. Yaghoobian*, 13 A.D.3d 424, 425 (N.Y.App. Div. 2004), for

---

[6] The court explained that a proper declaration establishing proof of mailing would describe the following steps: "(1) the witness placed a notice of cancellation of the subject policy in an envelope, (2) the envelope was addressed to [the insured] at the declared address, (3) the envelope was affixed with the proper postage, and (4) placed in the United States mail at a certain location." *Id.* at 759-60.

the proposition that it is proper for the Court to accept proof of the insurer's mailing policies and procedures and grant summary judgment based upon that evidence. In that case, the court explained the insurance company's mailing policies and procedures created a "rebuttable presumption" that the company mailed notice of its policy exclusions, and the insured's mere denial of receipt of that notice was insufficient to rebut the presumption upon summary judgment. *Id.* However, the court reviewed whether the insured had received notice of new coverage exclusions.

Here, in contrast, the Court is construing a specific policy provision requiring notice to the insured of policy termination. There is no Idaho authority creating a rebuttable presumption under similar facts. Idaho law is clear that unambiguous policy language must be construed according to its plain meeting, and nothing in the Policy's language creates a presumption of mailing notice of policy termination upon proof of the company's usual and customary mailing practices.

*In re Rural Route Neighbors*, 960 A.2d 856, 861 (Pa. Commnw. Ct. 2008), also does not support North American's argument that it is proper upon summary judgment to rely upon customary mailing procedures to establish a letter was sent when contrary proof is introduced. There, the issue was whether copies of ordinances enacted during a board of supervisors meeting were forwarded to the appropriate governing body. The Neighbors challenged the validity of the ordinances on procedural grounds, claiming the ordinances, once adopted, were not properly forwarded to the appropriate governing body and therefore of no effect. During the administrative hearing before the Zoning Hearing Board of East Buffalo Township, the Township offered the testimony of its Township

Solicitor, who testified he forwarded copies of the ordinances to the correct department. The Solicitor testified also regarding his customary procedures for mailing correspondence from his office. The board credited the Solicitor's testimony, and voted to dismiss the Neighbors' procedural challenge to enactment of the ordinances based upon insufficient mailing. The trial court reversed the board's decision.

Upon appeal, the appellate court held the trial court impermissibly reconsidered the weight to be accorded to the Solicitor's testimony, and invaded the province of the fact finder (the board). *Neighbors*, 960 A.2d at 861. Thus, while North American is correct that customary procedures regarding mailing were sufficient to show a letter was sent, the lesson learned from *Neighbors* is that it is the trier of fact's responsibility to weigh the credibility of that evidence and draw inferences from it. The appellate court noted that the board was required to draw its own inference, supported by the Solicitor's testimony, that it was more likely than not he forwarded copies of the ordinance in the manner he testified to. *Id.* Here, in contrast, the Court cannot make the same inference upon summary judgment under the facts before it. *Cf. Howard v. Ferrellgas Partners, L.P.*, 92 F.Supp.3d 1115, 1133-34 (D. Kan. 2015) (applying rebuttable presumption of mailing under Kansas law regarding buyer's receipt of sales agreement; however, there the court conducted a summary trial and weighed the testimony of the witnesses).

In the only case North American cites to support its argument that proof of customary mailing policies is sufficient to infer mailing and which involves an insurer, the case was not decided upon summary judgment. Rather, the case proceeded to a bench trial, and is therefore distinguishable. In *First Nat'l Bank of Independence v. Mid-Century*

*Ins. Co.*, 559 S.W.2d 50 (Mo. Ct. App. 1997), a bank sued an insurer, alleging that it did not receive notice prior to the insurer's cancellation of a policy that insured a car in which the bank had a security interest. Notice of cancellation was required. The insurance company submitted testimony of the custom and business practice in mailing cancellation notice.

The court, sitting without a jury, found in favor of the insurance company, considering the evidence of custom and business practice, and receipt of the notice by others, as evidence that the practice was followed. 559 S.W.2d at 52. Upon appeal, the bank argued consideration of the custom and business practices of the insurer was improper. However, in affirming the judgment of the trial court, the appellate court specifically commented: "[s]uch evidence was for consideration of the trier of fact in that regard." *Id.* Here, the jury will be the trier of fact.

The last case North American cites is *Edwards v. Toys "R" Us*, 527 F.Supp.2d 1197, 1201 (C.D. Cal. 2007). North American argues *Edwards* allows the Court to infer personal knowledge based upon an employee's review of internal documents and records, and that the individual may thereafter testify to acts or conduct he or she did not personally observe. The issue in that case was whether Toys "R" Us had properly implemented a software update to comply with the Fair and Accurate Credit Transactions Act ("FACTA"). In addition to employee affidavits concerning review of internal documents and records, the court had before it testimony from those with personal knowledge concerning the software update that caused the alleged violation under the FACTA. The sole issue upon summary judgment was whether the violation was

"willful." In *Edwards*, the court held it was proper for the court to consider affidavits describing the internal process for updating Toys "R" Us cash registers, given the affiant's job responsibilities included overseeing the software programming and maintenance of defendant's cash registers. *Edwards*, 527 F.Supp.2d at 1201. The court also had before it deposition testimony, emails, test results, and meeting minutes discussing the software modification process. *Id.* at 1204. In contrast here, there is no information in the Robbins Affidavit indicating he reviewed any records other than the Grace Notices (CPS's and the file copy) when reaching his conclusion that customary practices were followed.

Synthesizing the conclusions of the above case law, the crucial distinction here is the procedural posture of this case. North American asks the Court to infer, based upon custom and practice, that its custom and practice was followed at each and every point of the mailing process, and the June 8, 2015 Grace Notice was mailed in the customary manner on that occasion. North American asks also that the Court infer North American mailed the grace notice to Lynch based upon CPS's receipt of its copy of the same.[7] Lynch's testimony, and that of her husband, indicates they received every single grace notice previously mailed to them, as evidenced by their payments to North American to prevent the Policy from lapsing on more than 36 separate occasions. Yet, on this one occasion, Lynch claims she did not receive the notice.

---

[7] It is not clear in the record and was not clarified during the hearing when CPS's copy was mailed. Exhibit 2B to the Robbins Affidavit, which is purported to be CPS's copy of the June 8, 2015 grace notice, contained additional date stamps as follows: "2015/06/22 13:37"; "2016 01 18 15:38." (Dkt. 50-2.)

Lynch's testimony is sufficient to create a triable issue of fact. While the testimony regarding North American's custom and practice may be admissible, the inferences to be drawn from that evidence, together with Lynch's testimony of non-receipt, are for the jury to make. Additionally, Lynch would have the opportunity to cross-examine Robbins, and elicit testimony concerning the mailing vendor or other entities responsible for carrying out North American's customary mailing practices.

Based upon all the authorities the Court considered, the Court finds North American's other arguments—which focus upon delivery and receipt—irrelevant. The issue here is proof of mailing, which the Court finds is sufficiently disputed upon summary judgment by Lynch's claim of non-receipt of the June 8, 2015 Grace Notice, and her receipt of and response to 36 other grace notices at the same postal address. It is the province of the jury to weigh the evidence and determine if North American establishes proof of mailing of the June 8, 2015 Grace Notice.

### (2) *Constructive Notice*

North American alternatively argues Lynch had constructive notice that the Policy had lapsed, based upon the 36 grace notices mailed and received prior to June of 2015, as well as two telephone conversations in 2010 and 2011. However, the Policy's language is unambiguous that notice of termination must be mailed. Nothing in the Policy suggests otherwise, and North American has not presented sufficient authority applicable in the context of insurance contracts supporting its reliance upon constructive notice when

termination of an insurance policy is at issue.[8] *See Martin v. Argonaut Ins. Co.*, 434 P.2d 103, 108 (Idaho 1967) (holding that no constructive notice to insured arose from filing notice of termination with the Department of Insurance; insured was entitled to notice pursuant to the language of the policy).

The Court therefore holds North American cannot rely upon a theory of constructive notice in the presence of policy language requiring actual mailing.

## CONCLUSION

For the reasons explained herein, the Court sustains Lynch's evidentiary objection in part, and will deny Defendant's motion for summary judgment. On the undisputed facts before the Court, the issue of proof of mailing must be reserved for the trier of fact.

---

[8] In a footnote, North American cites *Margaret H. Wayne Trust v. Lipsky*, 846 P.2d 904 (Idaho 1993), tossing out a waiver argument. That case involved a real estate contract, not an insurance contract. There, the court held the defendant had, by his conduct, waived his right to avoid the real estate contract. 846 P.2d at 908. Here, there are no facts indicating Lynch voluntarily and intentionally relinquished her right under the Policy to receive notice according to the Policy's terms.

## ORDER

**NOW THEREFORE IT IS HEREBY ORDERED:**

1)      Defendant/CounterClaimant's Motion for Summary Judgment (Dkt. 48) is

**DENIED**.

2)      Plaintiff's Motion to Strike (Dkt. 64) is **GRANTED IN PART**.

3)      The Court will conduct a scheduling conference for the purpose of setting

pretrial deadlines and a trial date in this matter. A separate notice of hearing

will be forthcoming.



DATED: January 10, 2018

Honorable Candy W. Dale
United States Magistrate Judge